# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **TAMARA N. NASRALLAH,** | CASE NO. 1:19-CV-00795 |
| Plaintiff, | |
| -vs- | JUDGE PAMELA A. BARKER |
| **ROBERT HALF INTERNATIONAL, INC., et al.,** | MEMORANDUM OF OPINION AND ORDER |
| Defendants. | |

This matter comes before the Court upon the Motion for Summary Judgment of Defendants Robert Half International, Inc. ("RHI") and Lindsay Moran ("Moran") (collectively, "Defendants"). (Doc. No. 22.) Plaintiff Tamara Nasrallah ("Nasrallah") filed a brief in opposition on January 17, 2020, to which Defendants replied on January 31, 2020. (Doc. Nos. 25, 26.) For the following reasons, Defendants' Motion for Summary Judgment (Doc. No. 22) is GRANTED.

## I. Background

### a. Factual Background

RHI provides temporary and permanent personnel for businesses in various fields, such as accounting, finance, office administration, and marketing. (Doc. No. 22-3 at ¶ 2.) Accountemps is a division of RHI that provides temporary employees for accounting, finance, and bookkeeping positions. When a client seeks to fill an open position, RHI searches its database of candidates and provides suitable candidates to the client, who can then select the person that best matches its needs. (*Id.*)

RHI uses a database system called Salesforce to track its employees' recruiting, marketing, and placement activities. (Doc. No. 22-4 at ¶ 31.) This information allows managers to know whether their reports are attaining their goals. (*Id.*) RHI requires employees to contemporaneously document all of their communications with clients and potential clients in Salesforce. (*Id.* at ¶ 32.) Specifically, for emails and telephone calls, employees are expected to document communications immediately after the email or call, and for in-person visits at a client location, employees are expected to enter data once they return to the office. (*Id.*) RHI also uses this data to determine sales credits and award incentive compensation. (*Id.* at ¶ 31.) All activity logged in Salesforce is electronically time-stamped, which allows RHI to determine when data was initially entered or modified. (Doc. No. 22-3 at ¶ 22.)

In Northeast Ohio, RHI has offices in Cleveland, Beachwood, North Olmsted, Akron, and Canton. (*Id.* at ¶ 3.) Alan Reisinger ("Reisinger") is a Regional Vice President of RHI. (*Id.* at ¶ 1.) As part of his duties, Reisinger oversees all five Northeast Ohio offices, each of which is run by a branch manager. (*Id.* at ¶ 3.) Although branch managers handle all day-to-day matters, Reisinger typically visits each office on a weekly basis and remains available to RHI employees by phone and email. (*Id.*) Moran has been the branch manager of the North Olmsted office since 2012. (Doc. No. 22-4 at ¶ 2.)

In September 2016, Nasrallah started as an Accountemps staffing manager in the North Olmsted office. (*Id.* at ¶ 6.) She and Emily Eighmy ("Eighmy") were the only Accountemps staffing managers in the office during Nasrallah's employment. (*Id.*) Eighmy had started working as a staffing manager about a year earlier in November 2015. (Doc. No. 22-6 at ¶ 1.) Although Nasrallah had no prior experience in the staffing industry, Moran recommended that RHI hire her because she

2

had accounting experience, which Moran believed could be helpful in marketing Accountemps's services to clients. (Doc. No. 22-4 at ¶ 7.) Nasrallah's job consisted of marketing Accountemps's services via telephone, email, and in-person meetings and recruiting, interviewing, and matching professionals with clients' job orders. (*Id.* at ¶ 4.) Nasrallah received a salary and could receive additional compensation if she exceeded her goals. (*Id.* at ¶ 23.) The RHI corporate office sets several different goals for RHI staffing managers. (*Id.* at ¶ 10.) The most important of those goals are the number of hours candidates placed with RHI clients have worked and the gross revenue that has been paid by the clients for those candidates. (*Id.*)

Starting in October 2016, Nasrallah was consistently below her weekly hours goal. (Doc. No. 22-3 at ¶ 14, Ex. 1.) In late 2016, to improve office performance and play to the strengths of Nasrallah and Eighmy, the North Olmsted office moved to a modified "in and out" model. (Doc. No. 22-4 at ¶¶ 8-9.) This was based on an "in and out" model that had been implemented in other Northeast Ohio offices and RHI offices nationally, where some employees focused on recruiting candidates and filling job orders ("inside") and others focused on marketing ("outside"). (*Id.*; Doc. No. 22-3 at ¶¶ 8-9.) Under the model implemented at the North Olmstead office, Eighmy remained responsible for marketing for five clients, but primarily focused on recruiting candidates and filling job orders, while Nasrallah primarily focused on marketing. (Doc. No. 22-4 at ¶ 9.) Despite these changes, Nasrallah consistently missed her hours goals throughout her employment with RHI. (*Id.* at ¶ 11; Doc. No. 22-3 at ¶ 14, Ex. 1.)

In addition to struggling to hit her hours goals, Defendants assert that many of Nasrallah's emails to clients and candidates contained improper word use and significant spelling and

3

grammatical errors. (Doc. No. 22-4 at ¶¶ 18-19, Ex. 1.)[1] Moran was concerned because these errors projected an unprofessional image to RHI's candidates and clients, and it caused Moran—and Eighmy at Moran's direction—to spend time reviewing Nasrallah's emails prior to them being sent. (*Id.* at ¶¶ 20-21.) After being informed by Moran of the errors in Nasrallah's emails and reviewing one of Nasrallah's draft client emails that contained numerous errors, Reisinger instructed Moran to require Nasrallah to send all client emails to her for review. (Doc. No. 22-3 at ¶¶ 16-17.)

Nasrallah also submitted many job orders without information that RHI requires to process a job order, such as defined start dates, client contacts, agreed-upon pay rates, agreed-upon terms for conversion, and job descriptions. (Doc. No. 22-4 at ¶ 14.) Numerous disputes arose between Eighmy and Nasrallah regarding sales credit for filled job orders during Nasrallah's employment as well, although disputes of this nature were not uncommon among employees reporting to Moran. (*Id.* at ¶¶ 23-25; Doc. No. 22-6 at ¶ 18.) Nasrallah also routinely disrupted Eighmy's workday by requesting information that was available in Salesforce or would be discussed at a daily meeting at the end of the day. (Doc. No. 22-6 at ¶¶ 8-9.)

Moran met with her staffing managers, including Nasrallah, each week to discuss their performance and any other pending issues. (Doc. No. 22-4 at ¶ 26.) During these weekly meetings, Moran addressed Nasrallah's failure to meet her performance goals. (*Id.* at ¶ 27.) Moran also met with Reisinger each week to discuss the office performance and the performance of her staffing

---

[1] Nasrallah argues that Defendants' suggestion that errors in Nasrallah's emails were a constant problem is unfounded because Defendants submitted only four of Nasrallah's emails that contained errors over a nine-month period. (Doc. No. 25 at 2.) Nasrallah also asserts that Moran's declaration about errors contained in other emails is inadmissible under the best evidence rule. (*Id.*) In response, Defendants contend that the four emails were submitted as representative examples and that RHI employees with personal knowledge of Nasrallah's repeated errors in her emails may testify to that knowledge without running afoul of the best evidence rule. (Doc. No. 26 at 8.) The Court need not resolve this issue, however, as the exact extent of the errors in Nasrallah's emails is not relevant to the Court's decision.

managers. (*Id.* at ¶¶ 28-29.) Reisinger thus knew of Nasrallah's performance issues as they arose. (*Id.*; Doc. No. 22-3 at ¶ 16.)

During her employment, sometime in 2017, Nasrallah claims that Moran brought up the fact that there had been a terrorist attack in Columbus and said that it was probably another Arab, all Arabs are terrorists, and all Arabs are Muslims. (Doc. No. 22-8 at 26, 30, 36.)[2] According to Nasrallah, Moran made this statement generally to the office while Nasrallah, Eighmy, and potentially several other coworkers were present. (*Id.* at 26-29.) Nasrallah then objected to Moran's statement and explained that not all Arabs are Muslims, that she was Palestinian Christian and Arab-American, and that there are different ethnicities in the Middle East. (*Id.* at 30-31.) Nasrallah claims that Moran again stated that all Arabs are Muslims and that, in response, Nasrallah again explained her background and the different types of races and religious backgrounds in the Middle East. (*Id.* at 41-42.) After that, no one said anything else, and everyone continued with their day. (*Id.* at 45-46.) This was the first time that Moran learned that Nasrallah was Arab. (Doc. No. 22-5 at 81.)

In addition to this incident, Nasrallah claims that throughout her employment, Moran and Eighmy mocked and laughed at Nasrallah's mispronunciation of words and her accent. (Doc. No. 22-8 at 179-81.)[3] English is Nasrallah's second language. (*Id.*)

On May 11, 2017, what appears to be a couple of months after Moran's alleged statements regarding the terrorist attack, Nasrallah emailed Reisinger requesting to meet with him in confidence. (Doc. No. 22-3 at ¶ 28, Ex. 4.) Reisinger replied that he would be in North Olmsted on May 18, 2017, but could meet earlier if it was "an urgent conversation." (*Id.*) Nasrallah said that she could

---

[2] Moran and Eighmy both deny that Moran made this statement. (Doc. No. 22-4 at ¶ 42; Doc. No. 22-6 at ¶ 13.)
[3] Moran and Eighmy both deny that they engaged in this behavior as well. (Doc. No. 22-4 at ¶ 43; Doc. No. 22-6 at ¶¶ 13-14.)

5

"definitely wait until the 18th." (*Id.*)  Reisinger told Moran about the meeting, but said that he did not know what the meeting was about because Nasrallah had not told him. (*Id.* at ¶ 29.)  Moran also claims that she did not know what the meeting was about. (Doc. No. 22-4 at ¶ 44.)  However, a couple of weeks earlier, in late April 2017, Nasrallah had informed Moran that she wanted to transfer. (Doc. No. 22-8 at 158-59.)

On May 16, 2017, two days before Nasrallah's scheduled meeting with Reisinger, a representative of Lou-Ray Associates ("Lou-Ray") called the office about a job order without referencing or asking for a specific RHI employee. (Doc. No. 22-4 at ¶ 34.)  Nasrallah then set up a meeting with Lou-Ray, and Nasrallah and Moran visited Lou-Ray the next day to fill the job order. (*Id.*; Doc. No. 25-1 at ¶ 2.)

On May 18, 2017, Nasrallah emailed Moran about receiving placement credit for the filled Lou-Ray job order. (*Id.* at ¶ 36, Ex. 2.)  Moran previously reviewed RHI's Salesforce records when Lou-Ray called on May 16, 2017 and advised Nasrallah that those records showed she "hadn't marketed to them since January." (*Id.* at ¶¶ 35, 37, Ex. 2.)  Nasrallah responded that she spoke with Lou-Ray in February 2017 and had been leaving voicemails since then. (*Id.* at ¶ 37, Ex. 2.)  After receiving Nasrallah's response, Moran looked at the Salesforce records relating to Lou-Ray again, and discovered that Nasrallah had added three new events: a call on February 3, 2017 and voicemails on April 19, 2017 and May 2, 2017. (*Id.* at ¶ 38, Ex. 2.)  The timestamp for this data showed that Nasrallah entered it on May 18, 2017. (*Id.* at ¶ 38.)[4]  Moran emailed Nasrallah about the new events that had been recently added, and Nasrallah responded that she had merely updated the data. (*Id.* at

---

[4] At her deposition, Nasrallah testified that she entered these events earlier than the date showed by the timestamp. (Doc. No. 22-8 at 148-52.)

¶ 39, Ex. 2.) Nasrallah also wrote that she "ha[d] been trying to reduce [her] activity logs." (*Id.*) This exchange concerned Moran for two reasons. First, Moran believed Nasrallah was acting dishonestly, as the Salesforce timestamp showed that Nasrallah entered the three claimed contacts with Lou-Ray on May 18, 2017, yet Nasrallah denied that she had done so. (*Id.* at ¶ 40.) Second, in saying that she was reducing her activity logs, Nasrallah seemed to be admitting that she was not contemporaneously recording client contacts in Salesforce. (*Id.*)

Moran contacted Reisinger after these events. Defendants assert Reisinger decided to terminate Nasrallah based on her history of performance problems—including her consistent failure to meet her hours goals, error-ridden email communications, and difficulty working with Eighmy—and seeming dishonesty on the Lou-Ray order. (Doc. No. 22-3 at ¶¶ 23-24; Doc. No. 22-4 at ¶ 41.) However, Nasrallah asserts that Moran and Reisinger jointly made the decision. (Doc. No. 25-2 at 4.) Later that day, Moran notified Nasrallah of her termination. (Doc. No. 22-4 at ¶ 41.)

On May 19, 2017, after her termination, Nasrallah contacted RHI's Employee Relations Hotline to report alleged wrongful discrimination. (Doc. No. 22-7 at ¶ 6, Ex. 1.) Ted Mawla, in-house employment counsel for RHI, independently investigated Nasrallah's discrimination complaint and determined that Nasrallah's termination based on her performance was justified. (*Id.* at ¶¶ 2, 7-9, Ex. 2.) Mawla provided his conclusions to Nasrallah in a June 16, 2017 letter. (*Id.* at ¶ 10, Ex. 3.)

### b. Procedural History

On March 12, 2019, Nasrallah filed suit against Defendants in the Court of Common Pleas of Cuyahoga County, Ohio, alleging Defendants engaged in discriminatory and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and the Ohio Civil Rights Act, Ohio Rev. Code § 4112. (Doc. No. 1-1.) Nasrallah claims Defendants

7

discriminated against her because she is "olive-skinned and/or Arab-Middle-Eastern," and retaliated against her because she objected to Moran's comments related to Arabs. (*Id.* at ¶¶ 11-32.) On April 10, 2019, Defendants removed the action to this Court. (Doc. No. 1.)

Subsequently, on December 18, 2019, Defendants filed a Motion for Summary Judgment with respect to all of Nasrallah's claims. (Doc. No. 22.) Nasrallah filed a brief in opposition to Defendants' Motion for Summary Judgment on January 17, 2020, to which Defendants replied on January 31, 2020. (Doc. Nos. 25, 26.) As such, Defendants' Motion is ripe for consideration.

## II.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts

of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

**III. Analysis**

The Court analyzes Nasrallah's claims under Title VII and the Ohio Civil Rights Act together, as "Ohio's requirements are the same as under federal law." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003)); *Lindsey*, 295 F. App'x at 760 n.1 ("The Ohio Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination and retaliation claims."); *see* 42 U.S.C. §§ 2000e-2, 2000e-3; Ohio Rev. Code § 4112.02.

### a. Discrimination

Defendants assert that Nasrallah cannot establish a prima facie case of discrimination, and, alternatively, that Defendants have offered legitimate, non-discriminatory reasons for their actions that Nasrallah cannot show are pretextual. (Doc. No. 22-2 at 10-17; Doc. No. 26 at 2-5, 7-14.) In

9

response, Nasrallah asserts that Moran's statements about Arabs are direct evidence of discrimination sufficient to carry her burden to establish a prima facie case and that she can demonstrate pretext. (Doc. No. 25 at 6-8, 10-14.) The Court agrees with Defendants that Nasrallah cannot establish a prima facie case of discrimination.

Under Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may rely on either direct or circumstantial evidence to establish that an employer engaged in discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 865 (quoting *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). In other words, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* Importantly, "[t]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (quoting *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000)), *overruled on other grounds by Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009). Indeed, "direct evidence is the proverbial 'smoking gun.'" *Partin v. Weltman Weinberg & Reis Co. LPA*, 666 F. App'x 428, 433 (6th Cir. 2016) (quoting *Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016)). For

example, such evidence may take the form of "an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).

In the Sixth Circuit, discriminatory statements, such as racial slurs, by a decisionmaker may constitute direct evidence of discrimination under certain circumstances. For example, in *Talley v. Bravo Pitino Rest., Ltd.*, there was evidence that one of the owners and the general manager of the restaurant from which the plaintiff had been fired had used racial slurs on a number of occasions, including the use of the term "nigger." 61 F.3d 1241, 1243-44 (6th Cir. 1995), *overruled on other grounds by Gross*, 557 U.S. 167. The general manager also used racial slurs to express an opinion about the limited nature of the work he believed African Americans were capable of or should be performing, such as instructing other workers not to take out the trash by stating, "You don't need to be doing that. Let the niggers do it." *Id.* at 1244. The court held that these racist comments constituted direct evidence that the plaintiff's termination may have been racially motivated, noting that "the repeated usage of racial slurs" in the case could not be described as isolated or abstract. *Id.* at 1249.

In addition, in *DiCarlo*, the plaintiff's supervisor called him a "dirty-wop" and complained that "there were too many dirty wops around [the facility]." 358 F.3d at 411, 413. Just two weeks later, the supervisor requested that plaintiff be removed from his position, and plaintiff was terminated a week after that. *Id.* Plaintiff, who was of Italian-American heritage, alleged he had been discriminated against on the basis of his national origin, and the Sixth Circuit held his supervisor's comments were direct evidence of discrimination, finding that "the fact that the comments were made by Bailey, DiCarlo's immediate supervisor and a decision-maker, that they specifically negatively and derogatorily referenced DiCarlo's Italian–American heritage, and that the hate-speech occurred

11

three weeks prior to DiCarlo's termination, all culminate in the conclusion that DiCarlo has presented sufficient evidence of causation to withstand summary judgment." *Id.* at 417.[5]

In contrast to *Talley* and *DiCarlo*, however, the Sixth Circuit has held that stray or isolated comments unrelated to and removed in time from the challenged employment decision are not direct evidence of discrimination. For instance, in *Hopkins v. Elec. Data Sys. Corp.*, after learning that the plaintiff had Adult Attention Deficit Disorder ("ADD"), the plaintiff's supervisor referred to plaintiff as "the mentally ill guy on Prozac that's going to shoot the place up." 196 F.3d 655, 658 (6th Cir. 1999). The Sixth Circuit held that this "isolated and ambiguous comment" did not constitute direct evidence that the plaintiff's subsequent termination was discriminatory. *Id.* at 661. In so ruling, the court specifically distinguished *Talley*:

> Indeed, one major difference between *Talley* and this case is that the evidence in *Talley* showed that there had been repeated usage of racial slurs, whereas here there seems to have been only the one purported significant "slur" about Hopkins' handicap. The district court concluded that this particular comment, if made, cannot be [sic] "be interpreted as denigrating Plaintiff's job performance or suggesting that he either could not perform certain jobs or should only perform jobs of a lesser nature," and that "nothing in the comment can be interpreted as an expression of satisfaction at Plaintiff's misfortune of having the disability he claims to have." We agree with the district court's assessment and its conclusion that there was no direct evidence of discrimination in this case.

---

[5] The Sixth Circuit has noted some tension between the rulings in *Talley* and *DiCarlo* and subsequent Sixth Circuit decisions regarding the issue of when direct evidence can be based on discriminatory statements made outside the context of the decision to discharge the plaintiff. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012); *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 525-26 (6th Cir. 2007), *overruled on other grounds by Gross*, 557 U.S. 167. For example, in *Rowan v. Lockheed Martin Energy Systems, Inc.*, the Sixth Circuit held that statements by the plaintiffs' immediate supervisor calling them "old farts" on a "fairly regular basis" did not constitute direct evidence of discrimination, reasoning that "[s]ince the plaintiffs do not allege that they were made in relation to the decision to discharge the plaintiffs as part of the reduction in force, an inference is required that such a bias may have played a role in the decision to select these plaintiffs." 360 F.3d 544, 550 (6th Cir. 2004); *see also Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (holding "numerous racially insensitive statements" were not direct evidence of discrimination because they did not specifically mention the plaintiff); *Hein*, 232 F.3d at 489 ("Although the Big Boy sales updates, the references to 'weight limits,' and the 'Burger Boy' nicknames might raise a genuine issue of material fact as to Ludwinski's predisposition towards weight discrimination, Hein presented no evidence to connect Ludwinski's alleged prejudice against heavier individuals with his decision to fire Hein."). The Court need not resolve this potential conflict here, however, as the Court finds this case distinguishable from *Talley* and *DiCarlo*, as discussed below.

*Id.*

Similarly, in *Wilson v. Ohio*, the Sixth Circuit concluded that a superior's "reference to men as 'pig f—kers'" did not constitute direct evidence because "such a comment on its own requires an inference to conclude that sexist consideration motivated the employment decisions of which plaintiff complains." 178 F. App'x 457, 463 (6th Cir. 2006); *see also Foster v. Michigan*, 573 F. App'x 377, 393 (6th Cir. 2014) (holding a statement that "no woman should be making that kind of money" did not amount to direct evidence of sex-based discrimination, in part, because it was a singular statement unrelated to any adverse employment action); *Coleman v. Toys R Us, Inc.*, 976 F. Supp. 713, 718 (N.D. Ohio 1997) ("[T]here is no evidence to suggest that, even if true, the remark attributed to her was in any way related to the decisionmaking process. Therefore, the single isolated remark attributed to Ms. Owen constitutes a stray remark insufficient to shift the burden of proof to the Defendant.").

In this case, according to Nasrallah, at an undetermined time in 2017, Moran stated that a terrorist attack in Columbus had probably been committed by another Arab, all Arabs are terrorists, and all Arabs are Muslims. (Doc. No. 22-8 at 26, 30, 36.) Thus, even viewing the facts in the light most favorable to Nasrallah, her evidence of discrimination consists of a single derogatory statement unrelated to Nasrallah's employment or any decisions relating to her employment. Moreover, the statement was not directed at Nasrallah, as Nasrallah testified that Moran made the statement generally to the office. (*Id.* at 26-29.) This type of isolated comment does not constitute direct evidence that Defendants discriminated against Nasrallah, as numerous inferences would have to be made to conclude from Moran's stray remark that the eventual termination of Nasrallah was

motivated by impermissible discriminatory animus. *See Hopkins*, 196 F.3d at 661 (finding "one purported significant 'slur'" did not amount to direct evidence of discrimination).

In addition, because of the isolated nature of Moran's statement, this case is easily distinguishable from *Talley*, in which the repeated use of racial slurs was at issue. *See Talley*, 61 F.3d at 1249 n.2 ("[T]he repeated usage of racial slurs in this case cannot be termed isolated or abstract."). Although not cited by Nasrallah, the Court finds this case distinguishable from *DiCarlo* as well. In *DiCarlo*, the court found it significant that the supervisor's remark "specifically negatively and derogatorily referenced DiCarlo's Italian–American heritage." *DiCarlo*, 358 F.3d at 417. In contrast, Moran's statement did not specifically refer to Nasrallah, but was made to the office generally. Additionally, the court in DiCarlo noted that "the hate-speech occurred three weeks prior to DiCarlo's termination," and that "the temporal proximity between the discriminatory act and the termination creates a far different scenario, such that causation may be demonstrated with a lesser quantum of evidence than in other cases not involving such a tight time line of events." *Id.* Here, although the exact date of Moran's statement is unknown, Nasrallah's opposition brief indicates that it occurred "a few months" before her termination. (Doc. No. 25 at 9.) Thus, the temporal distance between Moran's statement and Nasrallah's termination is significantly greater. Finally, the supervisor in *DiCarlo* specifically stated that "there were too many dirty wops around [the facility]," *Dicarlo*, 358 F.3d at 413, thus directly connecting his statement to a desire to reduce the employment of those with the plaintiff's protected characteristic, whereas Moran's statement had nothing to do with Nasrallah's employment.

The rest of the cases cited by Nasrallah are also distinguishable and do not support her contention that Moran's statement constitutes direct evidence of discrimination. Two of the cases

did not even involve direct evidence. *See Goller v. Ohio Dep't of Rehab. & Corr.*, 285 F. App'x 250, 255 (6th Cir. 2008) (holding that a supervisor's "use of derogatory racial slurs cannot constitute direct evidence of discrimination"); *Fitch v. U.S. Foodservice Corp.*, No. CA2007-03-068, 2008 WL 217507, at *3 (Ohio Ct. App. 12th Dist. Jan. 28, 2008) ("[Plaintiff] has provided no evidence to suggest that [his immediate supervisor] or any other mid-level manager made discriminatory comments toward him."). And the other cases involved derogatory comments directly related to employment decisions. *See Wells v. New Cherokee Corp.*, 58 F.3d 233, 237 (6th Cir. 1995) ("Sharp displayed discriminatory bias against Wells because of her age when he told her that she was 'too old to do the job' and that a 'younger person could do more than' she could."); *Williams v. United Dairy Farmers*, 20 F. Supp. 2d 1193, 1196, 1201 (S.D. Ohio 1998) (finding supervisors' instructions to store managers to write up plaintiffs "for anything and everything as a way to get them fired" and "not to hire any more 'fucking niggers,'" was sufficient evidence to establish a prima facie case of discrimination). Therefore, the Court finds that Nasrallah has failed to offer any direct evidence of discrimination.

In the absence of direct evidence, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Kroger*, 319 F.3d at 865-66. Under this framework, "the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination." *Id.* at 866. To establish a prima facie case of discrimination, a plaintiff must "show that 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class." *Johnson v. Univ. of Cincinnati*, 215

F.3d 561, 572-73 (6th Cir. 2000). "The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to 'articulate some legitimate, nondiscriminatory reason' for taking the challenged action." *Kroger*, 319 F.3d at 866 (quoting *Univ. of Cincinnati*, 215 F.3d at 573). Finally, "[i]f the defendant is able to satisfy this burden, the plaintiff must then 'prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.*

In this case, Nasrallah relies exclusively on her argument with regard to direct evidence to oppose Defendants' Motion for Summary Judgment, and has not set forth any arguments or submitted evidence in support of establishing a prima facie case under the *McDonnell Douglas* framework. (*See* Doc. No. 25 at 6-8.) For example, as Defendants point out, Nasrallah has not offered evidence of any comparators treated more favorably than her. (Doc. No. 26 at 2.) As a result, the Court finds that Nasrallah has also failed to establish a prima face case of discrimination through circumstantial or indirect evidence under the *McDonnell Douglas* burden-shifting framework.

Accordingly, summary judgment in favor of Defendants on Nasrallah's discrimination claims is warranted.

### b. Retaliation

Defendants argue that Nasrallah's retaliation claim fails because she cannot demonstrate that she engaged in protected activity, cannot demonstrate the causation required to establish a prima facie case, and cannot demonstrate pretext even if she could establish a prima facie case. (Doc. No. 26 at 5-11.) Nasrallah asserts her objection to Moran's statement constitutes protected activity, that the temporal proximity to her termination satisfies the causation requirement, and that Defendants' legitimate, non-discriminatory reasons for termination have no basis in fact. (Doc. No. 25 at 8-12.)

The Court agrees with Defendants that Nasrallah has failed to establish a prima facie case of retaliation because she has not shown that she engaged in protected activity.

Title VII provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "Thus, this section prohibits an employer from retaliating against an employee who has 'opposed' any practice by the employer made unlawful under Title VII; and prohibits an employer from retaliating against an employee who has 'participated' in any manner in an investigation under Title VII." *Univ. of Cincinnati*, 215 F.3d at 578. In this case, Nasrallah relies on Title VII's "opposition clause," claiming that Defendants retaliated against her for opposing Moran's statement that all terrorists are Arabs. (Doc. No. 25 at 8-9.)

As with discrimination claims, a plaintiff may rely on either direct or circumstantial evidence to establish that an employer engaged in retaliation. *Daniels v. Pike Cty. Comm'rs*, 706 F. App'x 281, 291 (6th Cir. 2017). Here, Nasrallah has not offered any direct evidence in support of her retaliation claim.

Consequently, the *McDonnell Douglas* burden-shifting framework applies. *See Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation." *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014). "If the plaintiff succeeds in making out the elements of a prima facie case, the burden of production shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions." *Id.* Finally, "[i]f the defendant satisfies its burden of production, the burden

17

shifts back to the plaintiff to demonstrate that the defendants' proffered reason was not the true reason for the employment decision." *Id.*

"To establish a prima facie case of retaliation under Title VII, the plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the defendants knew of her protected activity; (3) thereafter, the defendants took 'materially adverse' actions against the plaintiff; and (4) the protected conduct was a but-for cause of the adverse action." *Id.*

With respect to the first element, "[w]hile a plaintiff need not file a formal charge of discrimination with the EEOC in order to engage in statutorily protected activity for purposes of Title VII, an employee may not invoke the protections of the statute merely 'by making a vague charge of discrimination.'" *Weltman v. Panetta*, No. 1:11CV 1229, 2012 WL 4955286, at *5 (N.D. Ohio Oct. 16, 2012) (quoting *Fox v. Eagle Distributing Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007)). "Rather, the employee must specifically make a complaint of an 'unlawful' employment practice." *Id* (granting summary judgment with respect to plaintiff's retaliation claim because "[h]e never told Gibson or any of Gibson's supervisors that he thought Gibson's practice was unlawful or violated his rights under Title VII")[6]

For example, in *Booker v. Brown & Williamson Tobacco Co., Inc.*, the plaintiff sent a letter to the defendant's human resources department alleging that his supervisor stated "I don't know if these people can comprehend asset management" in reference to African Americans and that recent criticism of the plaintiff's job performance was a "case of ethnocism." 879 F.2d 1304, 1309 (6th Cir. 1989). In considering the plaintiff's claim that the defendant had retaliated against him because of

---

[6] However, the plaintiff need only have "a reasonable and good faith belief that the opposed practices were unlawful." *Univ. of Cincinnati*, 215 F.3d at 579 (citation omitted).

18

his letter, the Sixth Circuit found that plaintiff had not engaged in any protected activity. With regard to the allegation of "ethnocism," the court held that the charge was too vague to invoke the protections of Title VII. *Id.* at 1313. Also, the court found that the plaintiff's complaint regarding his supervisor's racist statement did not allege that the defendant was "engaging in [an] unlawful employment practice, but that one of its employees has a racial intolerance," and therefore was not protected. *Id.*; *see also Addison v. Services to Enhance Potential, Western Wayne*, No. 17-11278, 2018 WL 7048462, at *4 (E.D. Mich. Nov. 27, 2018) ("Addison's complaint is not that STEP engaged in an unlawful employment practice, which he opposed, but that McGuire was inappropriate and rude to him because of his race. He does not explain how McGuire's actions violated Title VII. Accordingly, his threat to report her conduct was not protected activity under the opposition clause.").

In this case, Nasrallah's conduct does not even rise to the vague charge of discrimination at issue in *Booker*. At most, Nasrallah has provided evidence that she spoke up and corrected Moran after Moran's statements regarding Arabs. In her opposition brief, Nasrallah asserts that she also stated she was offended by Moran's comments. (Doc. No. 25 at 1, 7-8, 12.) But during her deposition, Nasrallah did not recall whether she actually used that term and instead testified it was clearly implied from her objection that she had been offended. (Doc. No. 22-8 at 30-31, 45.) Regardless, at no point before her termination did Nasrallah specifically complain to Moran, Reisinger, or any other RHI representative that Moran had discriminated against her or engaged in any other type of unlawful employment practice. As such, Moran's conduct does not constitute the type of activity that is protected by Title VII.

Nor do the cases relied on by Nasrallah support her argument, as each case involved a specific complaint by the plaintiff that he or she had been subjected to discrimination. *See Redlin v. Grosse*

19

*Pointe Pub. Sch. Sys.*, 921 F.3d 599, 614 (6th Cir. 2019) ("Plaintiff raised concerns to Dean about Hamka's comments and conduct toward her, which Dean understood as a harassment claim based on gender."); *Goller*, 285 F. App'x at 253 ("Shewalter had received notice that Goller perceived Smith as treating her in a racially discriminatory manner. Goller alleges that she complained to Shewalter about Smith's treatment of her at least three times prior to her termination."); *Fletcher v. U.S. Renal Care, Inc.*, 240 F. Supp. 3d 740, 752 (S.D. Ohio 2017) ("[Plaintiff] complained to Foley and Shelton about Nelson's alleged discrimination against him and in favor of African-American employees.").

Therefore, the Court grants Defendants' Motion for Summary Judgment with respect to Nasrallah's retaliation claims.

## IV. Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 22) is GRANTED.

**IT IS SO ORDERED.**

    *s/Pamela A. Barker*
PAMELA A. BARKER
Date: April 14, 2020    U. S. DISTRICT JUDGE